## FINK v. THE PITTSBURGH, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY CO.

*Carriers—Freight charges—Consignee not liable for underpayment of tariff charges, when—Doctrine charging shipper with notice of rate—Does not apply to consignee, when.*

1. A consignee, not a party to the contract of carriage nor the owner of the goods in transit, receiving such goods shipped in interstate commerce and paying the freight charged by the carrier thereon, who thereafter, relying upon the correctness of the freight charges, accepts the goods of the consignor and delivers the consideration without notice or knowledge of a higher rate or charge, is not liable for the balance of the true published tariff rate omitted through an error of the shipping clerk of the initial carrier.

2. The doctrine that a shipper is charged with notice of the true tariff freight rate, no matter how obscure or complex, does not apply to a mere consignee whose interest in the goods shipped and whose title thereto vests after delivery by the carrier.

(Decided July 15, 1914.)

ERROR: Court of Appeals for Montgomery county.

ALLREAD, J.; FERNEDING and KUNKLE, JJ., concurring.

This action originated before a justice of the peace. The railway company sought recovery of a balance of $15 alleged to be due it and its connecting carriers for the transportation of certain merchandise. The original bill of particulars based the claim upon contract. The amended bill rested upon the conveyance and delivery of the merchandise to Fink upon his request.

There was a verdict and judgment in the magis-

trate's court against the railway company. This judgment was reversed in the court of common pleas, where a final judgment was rendered for the railway company upon its claim.

The cause is brought to this court upon petition in error by Fink, seeking a reversal of the judgment of the court of common pleas and an affirmance of that of the justice of the peace.

It is contended on behalf of the plaintiff in error that the court of common pleas had no jurisdiction to reverse the judgment of the magistrate, because the motion for a new trial in the magistrate's court was not based upon the grounds stated in Section 10352, General Code.

We think it clear that the court of common pleas had no jurisdiction to grant a new trial upon the weight of the evidence. *Derby, Jr.,* v. *Heath,* 59 Ohio St., 54.

Under the broad language of the syllabus and opinion of the case cited, there is some plausibility to the contention that the verdict and judgment in the magistrate's court is final and not subject to a review upon any ground. But we have reached the conclusion that whether there was any evidence tending to support the defense in the magistrate's court was a question of law.

We rest this conclusion upon the decision in *Kaufman* v. *Broughton,* 31 Ohio St., 424, holding that whether there is any evidence tending to support the plaintiff's claim is a question of law, and it seems to us that the same principle should be applied to a case where the evidence does not tend to establish a defense. This question is raised in the

record by request to the magistrate to instruct the jury to render a verdict in favor of the plaintiff. While a magistrate is not ordinarily required to instruct the jury, yet the effect of this request was to test the sufficiency of the evidence to support the defense.

The only question, therefore, capable of review by the court of common pleas was whether the evidence tended to support the defense in the magistrate's court.

The judgment of reversal in the common pleas court can be sustained only in case all the evidence, giving it its most favorable construction in favor of the defendant in the magistrate's court, tended to support the railway company's claim.

The evidence in the bill of exceptions tends to show that in August, 1910, a shipper, whose full name does not appear, delivered a package marked "Indian curios" to the initial carrier at Los Angeles, California, billed to Alvin J. Fink, Dayton, Ohio, and that in due course of shipment the same was delivered to Fink upon his payment of the sum of $15, being the amount charged upon the bills and receipts tendered and exhibited to Fink. The testimony of Fink tends to show that there was no agreement between him and the consignor that he (Fink) should pay the freight. He further testifies that the goods were shipped to him for examination, under an arrangement that if upon examination the same proved satisfactory they were to be taken by Fink in exchange for certain gold coins which had previously been shipped by Fink to Los Angeles, California, where they were in custody

of the postmaster and subject to Fink's order. Fink testifies that he paid the freight charges of $15 to obtain possession of the goods, and that after examination and without any knowledge or notice that any other or additional freight charges were due he released the gold coins and the same, as well as the most part of the curios, are now scattered and their whereabouts unknown. The evidence shows that some considerable time after this transaction was entirely closed, the railway company discovered that the true tariff rate of shipment was $30 instead of $15, and this claim was thereupon asserted against Fink as consignee.

Was Fink as consignee, therefore, liable under the evidence as a conclusion of law? This question is to be determined under the common law as affected and controlled by the commerce acts of congress. Under the common law the shipper of goods was liable to carriers for the reasonable rate of transportation, and this rate was capable of being fixed by contract. The consignor was generally considered the shipper, as between him and the carrier, but the consignee was also held to be liable upon the contract of shipment for the freight charges where such consignee was the owner of the goods or requested or directed the shipment. While there is some conflict of authority, we think under the common law the consignee's liability for the freight charges, under the contract of shipment, was confined to cases where the consignee was in some way a party to the contract of shipment or was the owner of the goods transported. There was, however, a liability of the consignee, based

upon the receipt of the goods, upon which freight charges are due. His liability in this respect was entirely different from that of shipper. It rested upon the presumed intention or agreement of the parties at the time of delivery. *Blanchard* v. *Page,* 8 Gray, 281; *Cock* v. *Taylor,* 13 East, 309; *Old Colony Rd. Co.* v. *Wilder,* 137 Mass., 536.

There are some English as well as American decisions based upon an express stipulation in the bill of lading. wherein the consignee agrees to pay the freight, but where, as in the case at bar, there is nothing upon the face of the bill of lading tending to impose any liability upon the consignee, except that implied from the collection of the freight charges marked upon the bill, the liability of the consignee depends upon the circumstances of the case. Here Fink was not a party to the contract of shipment, was not the owner of the goods during transportation and his title vested and the consideration was delivered subsequent to his receipt of the goods. He paid the $15 charges, not by virtue of any agreement to do so, but because that amount was imposed as a lien upon the property and a condition of delivery. We think there are no circumstances in the case from which under the common law Fink would be held liable for any amount in excess of the $15 charged and paid at the time the merchandise was delivered. It is contended, however, that the effect of the interstate commerce act was to make it imperative on the railway company to collect from the consignee the full tariff rate, regardless of the mistake by the agents of the railway company and regardless of

the consignee's connection with the property or the shipment.

We have examined the following cases decided by the supreme court of the United States: *Tex. & Pac. Ry. Co.* v. *Mugg,* 202 U. S., 242; *Chicago & Alton Rd. Co.* v. *Kirby,* 225 U. S., 155; *Ill. Cent. Rd. Co.* v. *Henderson Elevator Co.,* 226 U. S., 441; *Tex. & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S., 426; *N. Y., N. H. & H. Rd. Co.* v. *Interstate Commerce Commission,* 200 U. S., 361.

All these cases were actions involving the shippers' rights as against the carrier and, therefore, involved the contract of shipment and the liability of the parties thereto. In none of these cases was the liability of the consignee directly involved. His rights must, therefore, be determined by the common law as modified by the interstate commerce act.

Section 6 of the interstate commerce act provides:

"That every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through and joint rate have been established. * * * The schedules printed as aforesaid by any such common carrier shall plainly state * * * all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggre-

gate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper or consignee."

Section 6 further provides:

"Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportaton of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

The interstate commerce act was amended June 18, 1910, so as to make the carrier criminally liable for a misquotation of rates.

The only direct reference to "consignee" in the interstate act is found in section 6, in connection with charges made and services rendered to the "passenger" or "shipper." We think this paragraph should be limited in respect to the consignee to one at whose instance the service was had and who becomes liable under the contract of shipment for the freight charges. This paragraph was not intended to create a new liability, but as a regulation of charges against persons at whose instance or for whose benefit the service was had.

The final reasoning brings us to a consideration of the paragraph of section 6 prohibiting the carrier from charging, demanding or collecting "a greater or less or different compensation" than the tariff rates. This prohibition is addressed specifically to the carrier, but, under the broad principle of public policy underlying the interstate commerce act, is sufficient to charge the shipper

or other party originating the service, who is bound
to take notice of the tariff rate, no matter how
obscure or difficult.

It is urged that the same inexorable rule of
public policy should be applied to the consignee, no
matter what his relation to the property is. This
contention is founded upon the second syllabus of
*Tex. & Pac. Ry. Co.* v. *Mugg, supra,* and also *L. &
N. Ry. Co.* v. *The Magnus Co.,* 13 C. C., N. S., 305.

In the Mugg case the liability of the consignee
was incidental, and the syllabus referred to relates
to the rights of the company at the time of delivery,
and should not in our opinion be generally applied
to all persons who happen to deal with railway com-
panies in relation to the property.

In the Magnus case the mistake in the freight
charge was discovered before the property was de-
livered, and the delivery was made under a general
arrangement charging the amount of the freight
against the shipper instead of collecting it before
delivery. We think the syllabus in the latter case,
as well as the opinion, should be limited by the
facts of the case, and so also the syllabus in the
Mugg case should be limited to cases where the
freight charge and the delivery are concurrent.
The rule of public policy, charging notice of the
tariff rates against shippers, does not apply with
equal reason to a mere consignee who receives and
deals with the property upon the faith of the rail-
road company's charges stated in the bill of lading.
Such consignee should not be charged like the orig-
inal shipper with the duty of ascertaining the public
tariff rates, nor is he chargeable with ascertaining
the fact as to whether all or only a portion of the

tariff rates are made chargeable against him.   Undoubtedly if the shipment had been delivered under a bill of lading showing freight paid, it could not in reason and justice be claimed that the consignee was bound to ascertain the fact of prepayment. Public policy does not require that our remedial laws should be made an instrument of injustice or oppression.

Fink, when he received the goods, found charged thereon, as shown upon the face of the bill of lading and receipt, the sum of $15.   We think he was not bound as a matter of law to go further in the investigation of the amount of charges, and having paid that, there would be no further personal liability.

It, therefore, follows that the judgment of the court of common pleas should be reversed and that of the magistrate affirmed.

*Judgment reversed.*

*Mr. Roy G. Fitzgerald,* for plaintiff in error.
*Messrs. Matthews & Matthews,* for defendant in error.